IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

Thermodyn Corporation,                          Case No. 3:07 CV 2491

                              Plaintiff,         MEMORANDUM OPINION
                                                 AND ORDER
              -vs-
                                                 JUDGE JACK ZOUHARY
3M Company, et al.,

                              Defendants.


## INTRODUCTION

Before the Court are a number of motions.  Plaintiff Thermodyn Corporation filed a Motion for Partial Summary Judgment (Doc. No. 73).  Defendants 3M Company and Dyneon LLC (together, "3M/Dyneon") filed a Motion for Summary Judgment (Doc. No. 72), as did Defendants Cary Kaufman and his companies, FKM Industries and Silaflex, Inc. (together, the "Kaufman Defendants") (Doc. No. 75).  Plaintiff filed a Motion in Limine (Doc. No. 80).  Finally, Plaintiff Thermodyn and the Kaufman Defendants filed a Joint Stipulation for Consolidation (Doc. No. 104) asking the Court to allow Thermodyn to amend its Complaint to add state law claims currently being litigated in the Lucas County Court of Common Pleas.

The Court held a hearing on November 12, 2008 to address all motions (Doc. No. 107). This Opinion and Order supplements rulings made at that hearing:  denied Plaintiff's Motion in Limine (Doc. 80); denied Joint Stipulation for Consolidation (Doc. No. 104); denied Plaintiff's Motion for

Partial Summary Judgment (Doc. No. 73); and granted in part and denied in part Defendants' Motions for Summary Judgment (Doc. Nos. 72 & 75).

## BACKGROUND

This case is about the alleged theft of trade secrets by a former employee who then allegedly provided the trade secrets to a competitor of his former employer.

Thermodyn manufactures fluoroelastomer sheeting and sells it in the form of industrial gaskets, expansion joints, and caulk. Fluoroelastomers are synthetic rubbers made from polymers containing fluorine. Thermodyn has a unique set of recipes and manufacturing processes it uses to produce its products. Over the years, Thermodyn has worked with its raw polymer suppliers to develop and improve its recipes and processes. Thermodyn also has developed a customer list throughout its years in business.

Dyneon LLC is a division of 3M Company. 3M/Dyneon produces the raw fluoropolymers used by companies, like Thermodyn, to produce fluoroelastomers. 3M/Dyneon does not make gaskets, belting, or expansion joints. Thermodyn did and continues to purchase some of its raw polymer from 3M/Dyneon, although Thermodyn purchases the bulk of its raw polymer from DuPont, 3M/Dyneon's competitor. Typically, before a customer like Thermodyn uses the raw polymer in its production, Thermodyn sends the raw polymer to an independent company which mixes the polymer with other chemicals to produce a compound.

To encourage customers to buy its raw polymer, 3M/Dyneon often supplies potential customers with free polymer. 3M/Dyneon also provides its customers with assistance in developing compound formulas with its product. In fact, 3M/Dyneon publishes compound formulas for its products on its website.

2

Cary Kaufman was hired by Thermodyn in March 1998 as the marketing director.  Kaufman's employment with Thermodyn was his first contact with the fluoroelastomer industry.  After several years, Kaufman was given the additional position of president of Global Sealing Systems, a division of Thermodyn.  Because of his position with Thermodyn, Kaufman had access to information about Thermodyn's products and production methods.  As part of his employment, Kaufman signed an agreement containing various restrictions, including a non-disclosure restriction, prohibiting him from disclosing any of Thermodyn's proprietary information, as well as non-competition and non-solicitation agreements, in which Kaufman agreed not to directly compete in the same market as Thermodyn within one year after leaving Thermodyn's employ.

Kaufman resigned from Thermodyn in early January 2005.  Kaufman told his former employer he was leaving to devote more time to personal pursuits.  However, in April 2005, Kaufman signed on as a consultant for 3M/Dyneon.  As part of his consulting agreement, in July 2005, Kaufman traveled to 3M/Dyneon's offices in St. Paul, Minnesota to meet with 3M/Dyneon representatives and to give a presentation about the fluoroelastomer market. Kaufman's consulting agreement with 3M/Dyneon specified that 3M/Dyneon did not wish to receive any third-party confidential information.

Shortly after leaving Thermodyn, Kaufman also formed two companies: Silaflex, Inc. and FKM Industries.  In March 2005, Kaufman formed Silaflex whose primary business was the distribution of rubber products for two companies.  Silaflex distributed silicone for Silicone Manufacturing, and it distributed extruded rubber and fluoroelastomer products for M-Cor.  In July 2005, Kaufman and a partner began planning the creation of FKM Industries, a company that would

manufacture flurorelastomer sheeting, thus becoming a competitor in the market with Thermodyn. Kaufman and his business partner planned to formally launch FKM Industries in the fall of 2006.

After starting FKM Industries and Silaflex, Kaufman began working with 3M/Dyneon to develop recipes for a product line of fluoroelastomer gasket sheeting. 3M/Dyneon provided Kaufman with formulas for fluoroelastomer compounds for manufacturing purposes. 3M/Dyneon also provided Kaufman with free polymer during this development period.

In addition to being a customer or potential customer of 3M/Dyneon, in November 2005, Kaufman also proposed that his companies and 3M/Dyneon enter into a business venture together (Doc. No. 73, Ex. 32). Kaufman proposed that, in addition to specifying that Dyneon material be used in the products he would make and sell, he might produce products that would bear the "Dyneon" brand, which Dyneon itself could then sell. Throughout his proposal, Kaufman used the term "partner" to describe the proposed relationship between the companies. The proposal was sent to 3M/Dyneon's Opportunity Assessment Team for review. 3M/Dyneon ultimately rejected the proposal in a letter dated March 20, 2006 (Doc. No. 75, Ex. M).

During this time, Kaufman was preparing a business plan and developing a potential customer base. According to Kaufman's sworn statement, he used publicly available databases in order to develop a potential customer list for his new endeavors.

In October 2006, soon after FKM Industries began implementing its business plan and pursuing customers, Kaufman and his companies were sued by Thermodyn in the Lucas County Court of Common Pleas. As a result of that lawsuit, 3M/Dyneon ceased providing raw fluoropolymer to Kaufman's companies. Thus, 3M/Dyneon never actually sold any raw fluoropolymer to Kaufman. This suit was filed in this Court in August 2007.

4

### MOTION IN LIMINE: SPOLIATION CLAIM

Plaintiff Thermodyn filed a Motion in Limine (Doc. No. 80) asking the Court to apply an adverse inference against both Defendants when considering Defendants' Motions for Summary Judgment and Plaintiff's Motion for Partial Summary Judgment.  As part of its Motion in Limine, Thermodyn also requests this Court instruct the jury to apply an adverse inference against Defendants with respect to certain missing evidence.  Defendants filed Oppositions to the Motion (Doc. Nos. 94 & 96).

Thermodyn argues the inference is appropriate because Kaufman deleted some e-mails and files from his Thermodyn laptop during October 2004.  In Ohio, the elements of a spoliation claim are:

"(1) pending or probable litigation involving the plaintiff, (2) knowledge on the part of defendant that litigation exists or is probable, (3) willful destruction of evidence by defendant designed to disrupt the plaintiff's case, (4) disruption of the plaintiff's case, and (5) damages proximately caused by the defendant's acts." *Ed Schmidt Pontiac-GMC Truck, Inc. v. Chrysler Motors Co.*, 575 F. Supp. 2d 837, 840 (N.D. Ohio 2008) (*quoting Smith v. Howard Johnson*, 67 Ohio St. 3d 28, 29 (1993)). "[W]illfulness contemplates not only an intentional commission of the act, but also a wrongful commission of the act." *Id.*

The e-mail deletions occurred when Kaufman ran a "cleanup" program in Microsoft Outlook Express before he left Thermodyn.  The cleanup program is a standard function of the Outlook Express program and is run periodically by the user to keep the computer operating efficiently. Kaufman returned the laptop at his departure, and the laptop has been in Thermodyn's control ever since.  (In fact, Jeff MacMillan, vice president at Thermodyn, has been using it.)  When litigation

5

began between the parties, Thermodyn took the laptop to a forensic computer expert who concluded the Outlook Express cleanup program was run eight times during a five-day window in October 2004. The expert was able to determine that the program deleted 389 e-mails from Kaufman's outbox.

The forensic expert also concluded that Kaufman deleted a number of unknown data files and e-mails from his computer during the course of his use of the laptop.  However, as Defendants point out, the deleted files are mostly images and instructions downloaded during Internet surfing and were deleted during normal computer upkeep.  Four types of Internet files (.aspx, .js, .htm, and .html files) account for nearly half of the 132,336 files.  Only 47 of the deleted files are .doc or .xls files -- the file types most likely to hold information that could be a trade secret or other damning evidence.  Further, Defendants argue most of these files were in fact recoverable at the time Kaufman returned the laptop to Thermodyn and at the time it was submitted for expert analysis.  Thermodyn chose not to recover the files.

Thermodyn speculates that because some files were deleted two months before Kaufman left Thermodyn, such files must have been relevant to this litigation and must have been intentionally destroyed in anticipation of Thermodyn filing a suit against Kaufman months later.  Conjecture is insufficient, especially when Thermodyn had the means to recover the content of these files. Thermodyn failed to show Kaufman "acted with intent to deprive another of the evidence by deliberately destroying it." *Ed Schmidt*, 575 F. Supp. 2d at 840.  Therefore, Thermodyn's Motion in Limine and request for a jury instruction are denied.

### SUMMARY JUDGMENT STANDARD OF REVIEW

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine

issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Federal Civil Rule 56(c).  The moving party bears the initial responsibility of "informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The movant may meet this burden by demonstrating the absence of evidence supporting one or more essential elements of the non-movant's claim. *Id.* at 323-25.  Once the movant meets this burden, the opposing party "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (*quoting* Federal Civil Rule 56(e)).

Once the burden of production has so shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations.  It is not sufficient "simply [to] show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  Rather, Rule 56(e) "requires the nonmoving party to go beyond the pleadings" and present some type of evidentiary material in support of its position. *Celotex*, 477 U.S. at 324; *see also Harris v. General Motors Corp.*, 201 F.3d 800, 802 (6th Cir. 2000). Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

"In considering a motion for summary judgment, the Court must view the facts and draw all reasonable inferences therefrom in a light most favorable to the nonmoving party." *Williams v. Belknap*, 154 F. Supp. 2d 1069, 1071 (E.D. Mich. 2001) (*citing 60 Ivy Street Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir. 1987)).  However, "at the summary judgment stage the judge's function is

7

not himself to weigh the evidence and determine the truth of the matter," *Wiley v. United States*, 20 F.3d 222, 227 (6th Cir. 1994) (*quoting Anderson*, 477 U.S. at 249); therefore, "[t]he Court is not required or permitted . . . to judge the evidence or make findings of fact." *Williams*, 154 F. Supp. 2d at 1071.  The purpose of summary judgment "is not to resolve factual issues, but to determine if there are genuine issues of fact to be tried." *Abercrombie & Fitch Stores, Inc. v. Am. Eagle Outfitters, Inc.*, 130 F. Supp. 2d 928, 930 (S.D. Ohio 1999).  Ultimately, this Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251-52; *see also Atchley v. RK Co.*, 224 F.3d 537, 539 (6th Cir. 2000).

### Count One: Civil RICO - 18 U.S.C. § 1964

Thermodyn filed a Motion for Partial Summary Judgment on a single element of the RICO claim -- the existence of a RICO "enterprise."  Defendants filed Motions for Summary Judgment on the RICO claim.

Under 18 U.S.C. § 1964, the RICO statute provides a private right of action for "[a]ny person injured in his business or property by reason of a violation of [18 U.S.C. § 1962]."  In turn, Section 1962 states in relevant part:

> (c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

Under Sixth Circuit law, in order to prove a violation of RICO, a plaintiff  must show: (1) the existence of two or more predicate offenses as evidence of a "pattern"; (2) the existence of an "enterprise"; (3) a nexus between the pattern of racketeering activity and the enterprise; and (4) an injury to business or property occurred as a result of the first three elements. *VanDenBroeck v.*

8

*CommonPoint Mortg. Co.*, 210 F.3d 696, 699 (6th Cir. 2000).  In addition, the Supreme Court has held that a RICO defendant must have not only participated in the scheme, but must have also participated in the operation or management of the enterprise itself.  *See Reves v. Ernst & Young*, 507 U.S. 170, 183 (1993).

### *Pattern*

RICO defines a "pattern of racketeering activity" as "at least two acts of racketeering activity." 18 U.S.C. § 1961(5).  Crimes comprising "racketeering activity" are listed under 18 U.S.C. § 1961(1) and are commonly referred to as "predicate acts."  The listed predicate acts include, among others: mail fraud (18 U.S.C. § 1341); wire fraud (18 U.S.C. § 1343); transportation of stolen property (18 U.S.C. § 2314); travel or transportation in aid of racketeering activity (18 U.S.C. § 1952); and receipt of stolen goods (18 U.S.C. § 2315), all of which Thermodyn has alleged occurred here.

The Supreme Court requires a RICO plaintiff do more than merely recite two predicate acts because "there is something to a RICO pattern beyond the number of predicate acts involved." *H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 238 (1989).  Rather, a plaintiff must show that "the predicate acts are related and that they **constitute or pose a threat of continued criminal activity**." *H.J. Inc.*, 492 U.S. at 239 (emphasis added).  It is this notion of "continuity plus relationship" which combines to produce a "pattern" under RICO.  *Moon v. Harrison Piping Supply*, 465 F.3d 719, 724 (6th Cir. 2006).

Thus, merely pointing to two predicate acts is insufficient to meet the pattern requirement. Plaintiff must present evidence of continuity.  "'Continuity' is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its nature projects into the future with a threat of repetition." *H.J. Inc.*, 492 U.S. at 241.  A closed period of continuity

may be demonstrated "by proving a series of related predicates extending over a substantial period of time." *Id.* at 242.  However, "[p]redicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement." *Id.*

In *Moon*, 465 F.3d 719, the Sixth Circuit held the plaintiff failed to state a RICO claim because he did not establish continuity. The plaintiff's claim was based on allegations his employer colluded with an insurance provider and a physician to deny him workers' compensation benefits.  The court found that, even though predicate acts occurring over a 30-month period may have constituted a "significant period of time," facts establishing a RICO pattern were still lacking because all of the alleged predicate acts "were keyed to [the defendants'] single objective of depriving [the plaintiff] of his benefits." *Id.* at 725.  Where a single objective is alleged, "the purported racketeering activity does not bear the markings of the long-term criminal conduct about which Congress was concerned when it enacted RICO." *Id.* at 725-26.

Here, to establish a RICO pattern, Plaintiff cites the predicate acts of wire fraud, mail fraud, transportation of stolen property, travel or transportation in aid of racketeering activity, and receipt of stolen goods.  All of the alleged predicate acts revolve around the alleged transmission of trade secrets from Kaufman to 3M/Dyneon.  Misappropriating trade secrets is not a RICO predicate act. Thus, the relevant question here is whether there is an ongoing threat of wire fraud, mail fraud, or theft.  Assuming *arguendo* that the conduct of Defendants amounted to the alleged crimes,[1] Plaintiff has failed to allege facts establishing that Kaufman and 3M/Dyneon pose a threat of continued criminal activity.  Much like the defendants in *Moon*, all of the alleged predicate acts here are in furtherance of a single alleged objective -- to transfer protected information from Thermodyn to

---

[1] The Court makes no judgment about the validity of the underlying allegations of criminal conduct.

10

3M/Dyneon through Kaufman.  Kaufman and 3M/Dyneon do not and did not appear to have a relationship that extended beyond this singular alleged purpose; thus there does not appear to be a threat of ongoing fraud or theft crimes here.

### Enterprise

Under RICO, an "enterprise" includes "any individual, partnership, corporation, association, or other legal entity, and union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4).  Thus, the statute provides two ways in which a RICO plaintiff can establish an enterprise: (1) proving the existence of a legal entity joining the parties; or (2) proving the existence of an association in fact between the parties.

Here, no legal document existed between Kaufman and 3M/Dyneon establishing a partnership under any state's laws.  Thus, there was no *de jure* partnership between Defendants.  Thermodyn nonetheless argues that a *de facto* partnership existed. Defendants dispute this characterization.

In Ohio, the term "partnership" is defined as "an entity of two or more persons to carry on as co-owners a business for profit." R.C. § 1775.05(A).  Whether two parties have created a joint venture or some other relationship amounting to a partnership depends upon their actual intention.  *Hunter v. BPS Guard Servs., Inc.*, 100 Ohio App. 3d 532, 553 (1995).

The court in *In re Estate of Ivanchak*, 169 Ohio App. 3d 140, 144 (2006) listed objective indicators of an intent to be bound and associate with another party.  The court held that "[t]he receipt by a person of a share of the profits of a business is prima-facie evidence that he is a partner in the business."  *Id.*  Other non-exclusive factors identified by the *Ivanchak* court included: (1) the existence of a written or oral partnership agreement; (2) the joint ownership and control of property;

11

(3) the ability of members to bind the business entity; and (4) the nature of the tax returns filed by the business entity. *Id.*

Here, Thermodyn has failed to put forth evidence establishing that there was a meeting of the minds between Kaufman and 3M/Dyneon to form a partnership. Thermodyn cites Kaufman's use of the term "partner" in his proposals to 3M/Dyneon and in his description of his relationship with 3M/Dyneon to others, as well as 3M/Dyneon's use of the word. Mere words describing the relationship, however, do not establish the existence of a partnership; the Court must look to Defendants' behavior to make that determination. The evidence shows that 3M/Dyneon rejected Kaufman's partnership proposal in a March 20, 2006 letter to him (Doc. No. 72, Ex. M). Further, Thermodyn offers no evidence Defendants shared in any profits or losses, had the ability to bind each other or jointly controlled property. The hallmarks of a partnership are absent here.

Thermodyn points to 3M/Dyneon's assistance and support of Kaufman as evidence of a legal partnership. Providing assistance, even if it was extraordinary assistance as Plaintiff alleges,[2] does not create a partnership absent a meeting of the minds to be bound to one another. Further, there is evidence this type of support is common of a relationship between a supplier and new customer in this industry (*see, e.g.,* Doc. No. 75, Exs. O & P).

Because Thermodyn failed to establish that there was a legal partnership, the existence of an enterprise requires proof of an association in fact. An association-in-fact enterprise "can be proven by showing: (1) that the associated persons formed an ongoing organization, formal or informal; (2)

---

[2] Specifically, Plaintiff maintains 3M/Dyneon assisted Kaufman by (1) developing a product line for FKM; (2) providing FKM with 3,000 pounds of free polymer; and (3) assisting FKM with marketing, all of which Kaufman suggested to 3M/Dyneon in his proposal that 3M/Dyneon ultimately rejected (Doc. No. 81, pp. 10-11).

that they functioned as a continuing unit; and (3) that the organization was separate from the pattern of racketeering activity in which it engaged."[3] *VanDenBroeck*, 210 F.3d at 699.

The Sixth Circuit has elaborated on the type of organization required for a RICO association-in-fact enterprise. There must be evidence there is an ongoing power **structure**, with each party to the enterprise assuming a distinct responsibility such that there is a division of labor. *United States v. Johnson*, 440 F.3d 832, 840 (6th Cir. 2006) (emphasis added). As the court explained in *Johnson*:

> The hallmark of an enterprise is structure . . . . [T]here must be some structure, to distinguish an enterprise from a mere conspiracy, but there need not be much. A RICO enterprise is an ongoing structure of persons associated through time, joined in purpose, and organized in a manner amenable to hierarchical or consensual decision-making. The continuity of an informal enterprise and the differentiation among roles can provide the requisite structure to prove the element of enterprise.

*Id.* (*quoting United States v. Rogers*, 89 F.3d 1326, 1337 (7th Cir. 1996)).

In *VanDenBroeck*, the court held that simply conspiring to commit a fraud is not enough to trigger RICO liability if the parties are not organized in a fashion that would enable them to function

---

[3]

Plaintiff argues that the third element is no longer required by the Sixth Circuit (Doc. No. 83, pp. 22-23). This element of the *VanDenBroeck* holding, however, has never been overruled. A survey of recent district court decisions shows courts within the Sixth Circuit continue to apply the third element when evaluating association in fact. *See, e.g., Star Waste Servs., LLC v. U.S. Waste, LLC*, No. 1:07-CV-127, 2008 WL 2066442 (E.D. Tenn. May 13, 2008); *Hager v. ABX Air, Inc.*, No. 2:07-CV-317, 2008 WL 81929 (S.D. Ohio Mar. 25, 2008); *Bergin Fin., Inc. v. First Am. Title Co.*, No. 05-70015, 2008 WL 268823 (E.D. Mich. Jan. 29, 2008); *Polzin v. Barna & Co.*, No. 3:07-CV-127, 2007 WL 4365760 (E.D. Tenn. Dec. 11, 2007). Further, the Court believes Plaintiff's reliance on *United States v. Johnson*, 430 F.3d 383 (6th Cir. 2005) as support for its proposition is misplaced. The *Johnson* court did not eliminate the third element but rather explained that the same proof used to establish the predicate acts could be used to satisfy the enterprise requirement. *Id.* at 391 ("We do not, however, read *Turkette* to hold that proof of these separate elements be distinct and independent, as long as the proof offered is sufficient to satisfy both elements.").

13

as a racketeering organization for other purposes. *VanDenBroeck*, 210 F.3d at 699.  Some minimal level of organizational structure between the entities involved is required. *Id.*

Here, Thermodyn has not established the existence of an organized structure between Kaufman and 3M/Dyneon.  Thermodyn has made no attempt to identify and describe how Defendants organized themselves in order to carry out the pattern of racketeering.  There is no evidence that 3M/Dyneon controlled or directed Kaufman's activities or vice versa. Additionally, Thermodyn has failed to establish that Defendants had a relationship distinct from the alleged illegal purpose of misappropriating trade secrets.  In sum, Thermodyn has not established Defendants colluded in a manner that extends beyond a simple conspiracy, and therefore Thermodyn failed to establish the existence of an association in fact.

### Nexus

The nexus element requires Plaintiff to articulate in what manner Defendants' activities furthered the alleged racketeering scheme. *Whaley v. Auto Club Ins. Ass'n*, 129 F.3d 1266, at *3 (6th Cir. 1997).  "To establish that an enterprise's affairs have been conducted 'through' a pattern of racketeering activity, there must be a nexus between the enterprise and the racketeering activity." *United States v. Qaoud*, 777 F.2d 1105, 1115 (6th Cir. 1985).

Here, as discussed above, Plaintiff failed to set forth sufficient facts establishing the existence of a pattern and an enterprise.  Therefore, the nexus element is moot.

*Resulting Injury*

The final element requires a RICO plaintiff to show that the defendants' alleged criminal activity caused it to suffer an injury to the business or property.  In *Sedima v. Imrex Co.*, 473 U.S. 479, 496 (1985), the Supreme Court held that a plaintiff must show injury caused "by the conduct constituting the [RICO] violation."

Here, as discussed above, Thermodyn failed to set forth facts sufficient to establish the existence of an enterprise and a pattern.  Therefore, any injury cannot be the result of a RICO violation.

**Count Two: Conspiracy to Violate RICO - 18 U.S.C. § 1964**

Section 1962(d) of RICO states that "[i]t shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section."  Under this section of the RICO statute,  "[a] RICO conspiracy count must plead an agreement to engage in specified conduct which would violate RICO." *Pik Coal Co. v. Big Rivers Elec. Corp.*, 200 F.3d 884, 890 (6th Cir. 2000).          Because Thermodyn failed to establish a RICO violation or an agreement to engage in conduct that amounts to a RICO violation, the Court granted Defendants' Motions for Summary Judgment.  It follows that the conspiracy count is dismissed as well.

## JURISDICTION

Having dismissed the claims giving rise to federal jurisdiction, the issue before the Court is whether it may continue to entertain the supplemental state law claims.  Next, as a general rule, if claims over which the Court has original jurisdiction are dismissed before trial, the state claims should be dismissed as well. 28 U.S.C. § 1367(c)(3); *United Mine Workers v. Gibbs*, 383 U.S. 715, 726 (1966).  However, under certain circumstances the Court may depart from this rule if there is good

15

reason. *See Javitch v. Capwill*, 284 F. Supp. 2d 848, 858 (N.D. Ohio 2003). "District courts have broad discretion in deciding whether to exercise supplemental jurisdiction." *Pinney Dock & Transp. Co. v. Penn Cent. Corp.*, 196 F.2d 617, 620 (6th Cir. 1999).

Here, the interest of judicial economy motivates the Court to stray from the general rule. Although the federal law issues have been dismissed (Counts One and Two) and there is no diversity of parties here, the Court will not dismiss the remaining state law claims. The parties have spent a great deal of time and energy litigating this case to this point (over 15 months and more than 100 entries on the docket). Although there is a companion case pending in the Lucas County Court of Common Pleas, Defendant 3M/Dyneon is not a party to that action, and the case here has advanced further along with an earlier trial date.

### Count Three: Ohio Corrupt Activity Act - R.C. §§ 2923.32, et seq.

The Ohio Corrupt Activities Act, Ohio's RICO statute, is directly adopted from the federal RICO statute, and the same analysis applies to it as the federal statute. *Bird v. Delacruz*, 411 F. Supp. 2d 891, 894 (S.D. Ohio 2005) (*citing Ohio v. Nasrallah*, 139 Ohio App. 3d 722, 745 at n.1 (2000)); *Universal Coach, Inc. v. N.Y.C. Transit Auth.*, 90 Ohio App. 3d 284 (1993).

For the same reasons listed in the Court's analysis of Count One, Plaintiff has failed to allege facts establishing the existence of a RICO "pattern" and a RICO "enterprise." Therefore, the Court denies Plaintiff's Motion for Partial Summary Judgment on the issue of "enterprise" and grants Defendants' Motions for Summary Judgment at to Count Three.

### Count Four: Ohio Uniform Trade Secrets Act - R.C. §§ 1333.61, et seq.

Plaintiff claims Defendants Kaufman and 3M/Dyneon misappropriated information constituting trade secrets. Plaintiff argues the following information was misappropriated:

16

1. Caulk formula
2. Regrind process
3. Customer lists
4. 2161X polymer formula
5. Industry information (including pricing and market information)

The Ohio Uniform Trade Secrets Act ("OUTSA"), R.C. §§ 1333.61-69, establishes a claim for misappropriating[4] trade secrets.  In order to prevail on a misappropriation-of-trade-secret claim in Ohio, a plaintiff must establish: (1) the existence of a trade secret; (2) the acquisition of a trade secret as a result of a confidential relationship; and (3) the unauthorized use of a trade secret. *Heartland Home Finance, Inc. v. Allied Home Mortg. Capital Corp.*, 258 F. App'x 860, 861 (6th Cir. 2008) (interpreting R.C. §§ 1333.61, et seq.).

### Existence of a Trade Secret Under OUTSA

The burden is on Plaintiff to prove that information has trade secret status. *State ex rel. Besser v. Ohio State Univ.*, 89 Ohio St. 3d 396, 400 (2000).  OUTSA defines "trade secret" as:

> information, including the whole or any portion or phase of any scientific or technical information, design, process, procedure, formula, pattern, compilation, program, device, method, technique, or improvement, or any business information or plans, financial information, or listing of names, addresses, or telephone numbers, that satisfies both of the following:
>
> > (1) It derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and

---

[4] Under R.C. § 1333.61(B), "Misappropriation" means any of the following: (1) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; (2) Disclosure or use of a trade secret of another without the express or implied consent of the other person by a person who did any of the following: (a) Used improper means to acquire knowledge of the trade secret; or (b) At the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret that the person acquired was derived from or through a person who had utilized improper means to acquire it, was acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use, or was derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or (c) Before a material change of their position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

17

(2) It is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

R.C. § 1333.61(D).  The Ohio Supreme Court adopted a six-factor test to determine the existence of a trade secret.  The factors are:

(1) [t]he extent to which the information is known outside the business; (2) the extent to which [the information] is known to [employees] inside the business * * * ; (3) the precautions taken by the holder of the trade secret to guard the secrecy of the information; (4) the savings effected and the value to the holder in having the information as against competitors; (5) the amount of effort or money expended in obtaining and developing the information; and (6) the amount of time and expense it would take for others to acquire and duplicate the information.

*State ex rel. The Plain Dealer v. Ohio Dep't of Ins.*, 80 Ohio St. 3d 513, 524-25 (1997) (*quoting Pyromatics, Inc. v. Petruziello,* 7 Ohio App. 3d 131, 134-35 (1983)).  The determination of whether information constitutes a trade secret is a highly fact-specific inquiry. *DeBoer Structures Inc. v. Shaffer Tent & Awning Co.*, 233 F. Supp. 2d 934, 948 (S.D. Ohio 2002).

While no single factor of the *Plain Dealer* test is dispositive, the Sixth Circuit emphasized that "a business or possessor of a potential trade secret must take some active steps to maintain its secrecy in order to enjoy presumptive trade secret status" because "once material has been publicly disclosed, it loses any status it ever had as a trade secret." *Heartland Home Finance, Inc.,* 258 F. App'x at 862. Thus, disclosure to potential or actual customers, absent a confidential agreement or understanding, will destroy any protection of that information as a trade secret. *R & R Plastics, Inc. v. F.E. Myers Co.*, 92 Ohio App. 3d 789, 802 (1993).  To that extent, duplication of design features on a publicly available product through "reverse engineering" in the absence of a confidential relationship will not support a trade secret misappropriation claim. *Id.* at 800.

In addition to its confidential nature, the purported trade secret must be novel in the sense that it is information not generally known to others in the industry.  *Id.* at 801.  Evidence of a trade secret

18

is demonstrated by showing the extent to which the information is known outside the business and the precautions the plaintiff has taken to guard the secret nature of the information. *DeBoer Structures Inc.,* 233 F. Supp. 2d at 947.

Customer lists and pricing information can constitute trade secrets.  In *Avery Dennison Corp. v. Kitsonas*, 118 F. Supp. 2d 848 (S.D. Ohio 2000), the court found, for preliminary injunctive purposes, that information relating to an employer's customer lists, pricing information, sales strategies, and business philosophy were trade secrets under R.C. § 1333.61(D).  Further, the Ohio Supreme Court recently held that information otherwise a trade secret under OUTSA does not lose its status as a trade secret because it was memorized rather than physically taken. *Al Minor & Assocs. v. Martin*, 117 Ohio St. 3d 58 (2008).

### *The Information Allegedly Misappropriated*

There is a genuine issue as to whether some of Thermodyn's claimed trade secrets are in fact trade secrets under the law, and there is a genuine issue as to the actual misappropriation itself -- whether Kaufman provided any of the alleged trade secrets to 3M/Dyneon.  These are highly fact-sensitive inquiries more appropriately resolved by the trier of fact.  The Court finds that three of the claimed secrets survive Defendants' Motions for Summary Judgment.

As a preliminary matter, the Court notes and rejects Thermodyn's argument that information is a "trade secret" merely because Thermodyn has labeled it so in confidentiality agreements with Defendants.[5]  Trade secret is defined by law, not by the parties to a contract.  A breach of contract

---

[5]

"Every Defendant, including Kaufman has signed an agreement which specifically acknowledges that the type of information Thermodyn claims to be a trade secret is, in fact, a trade secret. * * * As a result, the Defendants should now be prevented from arguing otherwise" (Doc. No. 81, p. 20).

19

claim is not before this Court.  The efforts to keep information confidential is but one factor in the *Plain Dealer* analysis.

Caulk Formula.  Defendants argue the formula was one commonly known in the industry. However, Thermodyn has put forth contradicting evidence by way of James Denham's expert testimony concerning the inclusion of PTFE in 3M/Dyneon's caulk formula.[6] Defendants also argue Kaufman did not have access to the formula, and therefore could not have transmitted it to 3M/Dyneon.  However, Thermodyn has put forth credible evidence that Kaufman did have access by way of the November 22, 2002 handwritten letter from Don Close to Kaufman (Doc. No. 81, Ex. 3) and the deposition of Jeff MacMillan (Doc. No. 83, Ex. 43).  Defendants also argue that 3M/Dyneon's formula is substantially different from Thermodyn's, precluding a claim that 3M/Dyneon misappropriated the formula. Thermodyn disagrees with this characterization.  In sum, there are clearly disputed issues of fact here which preclude summary judgment as to the caulk formula.

Regrind.  Defendants argue Kaufman never acquired knowledge about regrind and that the use of regrind was well known in the industry.  However, Thermodyn has put forth credible evidence to the contrary by way of Timothy Kinsky's deposition in which he claims this was "new information" (Doc. No. 81, Ex. 27).  Further, the call reports (Doc. No. 81, Ex. 28) and the testing sheets (Doc. No. 81, Ex. 29) establish an issue of fact as to whether Kaufman had knowledge of regrind.  Thus, there are genuine issues of material fact precluding a grant of summary judgment with respect to the regrind.

---

[6]

Doc. No. 81, Ex. 26 ("Q: And the only caulk recipe known by you to be possessed by Dyneon is the caulk recipe developed by you for Cary Kaufman and FKM-Industries, correct? A: Correct.").

Customer List.  Defendants argue the customer list does not qualify as a "trade secret" because this information could be easily obtained (e.g., via publicly available databases).  However, the ease and value in obtaining the customer list is but one of the factors set forth in *Plain Dealer*.  Thermodyn has offered the opinion of its expert, Dr. James Alexander, about the difficulty and expense involved in accumulating such a list (Doc. No. 75, Ex. A at p. 5).  Defendants also argue that Kaufman never possessed customer lists.  However, Thermodyn has put forth evidence that he did, namely the December 8, 2006 e-mail from Kaufman to Kendall Allen (Doc. No. 81, Ex. 23).  Further, under the Ohio Supreme Court's recent holding in *Al Minor & Assocs.*, memorizing information rather than physically taking information does not preclude granting trade secret status to that information.  On this Record, there are genuine issues of material fact which preclude a grant of summary judgment with respect to the customer list.

2161X Polymer.  Thermodyn argues that 2161X (which was produced by 3M/Dyneon and sold to Thermodyn) is a trade secret because it was previously exclusively sold by 3M/Dyneon to Thermodyn.  Defendants argue this polymer was well known in the industry and that Kaufman never had access to the 2161X formula.  Defendants also note that the 2161X polymer was created by 3M/Dyneon and used by Thermodyn, and therefore Thermodyn cannot claim a proprietary interest in it as a trade secret.  Thermodyn argues that 3M/Dyneon was only able to develop this product because Thermodyn gave 3M/Dyneon customer information necessary to develop 2161X, such that it was implicit that Thermodyn had an ownership interest in 2161X.  Thermodyn cites an e-mail written by Therese Tokles (Doc. No. 83, Ex. 54) as evidence of its proprietary interest in 2161X.

The Court finds the 2161X polymer does not qualify as a trade secret under OUTSA, largely because 3M/Dyneon created it without a confidentiality agreement with Thermodyn.  Therefore, there

21

is no proprietary interest on which Thermodyn can base its claim of trade secret status. The Court agrees with Defendants that simply because Thermodyn requested 3M/Dyneon create a particular polymer, it does not then have a proprietary interest in the resulting polymer developed and produced by 3M/Dyneon.[7]

Industry Information. Thermodyn failed to identify specific information that qualifies as a trade secret with respect to this claim. Rather, Defendants argue, Thermodyn's allegations are merely vague generalities. Thermodyn counters that information about pricing, market size, and market share that Kaufman provided to 3M/Dyneon during his consultant presentation constitutes protected trade secrets. However, Thermodyn fails to cite any evidence establishing the proprietary or confidential nature of this information.

In conclusion, the Court denies summary judgment on the trade secret claim with respect to the caulk formula, the regrind process, and the customer list; and grants summary judgment with respect to 2161X and industry information.

**Count Five: Conversion**

The Court grants summary judgment on Count Five because the Court finds Count Five is preempted by Count Four under OUTSA.

OUTSA makes clear that it is intended to displace certain other state law claims. The relevant section provides:

> (A) Except as provided in division (B) of this section, sections 1333.61 to 1333.69 of the Revised Code displace conflicting tort, restitutionary, and other laws of this state providing civil remedies for misappropriation of a trade secret.

---

[7]

An apt analogy was presented by 3M/Dyneon's counsel at oral argument: If I write to General Motors and ask for a car that flies through the air, which GM's engineers then proceed to develop and produce, I do not have a trade secret interest in the flying car merely because I requested the product.

(B) These sections do not affect any of the following:
  (1) Contractual remedies, whether or not based on misappropriation of a trade secret;
  (2) Other civil remedies that are not based on misappropriation of a trade secret;
  (3) Criminal remedies, including those in other sections of this chapter, whether or not based on misappropriation of a trade secret.

R.C. § 1333.67. The test to determine whether a state law claim is displaced by OUTSA is to determine whether "the claims are no more than a restatement of the same operative facts" that formed the basis of the plaintiff's statutory claim for trade secret misappropriation. *Glasstech, Inc. v. TGL Tembering Sys., Inc.*, 50 F. Supp. 2d 722, 730 (N.D. Ohio 1999). Under this rubric, *Glasstech* held that OUTSA preempted the plaintiff's common law claims for misuse and misappropriation, unfair competition, and unjust enrichment. *Id.*

An Ohio appellate court specifically held OUTSA displaced a claim for conversion. In *Midwest Energy Consultants, L.L.C. v. Utility Pipeline, Ltd.*, No. 06CA00048, 2006 WL 3423410 (Ohio Ct. App. Nov. 27, 2006), the court upheld the trial court's grant of summary judgment on the conversion claim brought by a plaintiff suing for misappropriation of trade secret under OUTSA. In so holding, the court explained, "[w]e recognize the Ohio Trade Secrets Act does not supersede *all* possible variances of a claim for conversion. However, where, as here, the claim for conversion involves documentary property which inherently contains trade secrets, the Act necessarily supersedes such claims." *Id.* at *7. Thus, *Midwest Energy*, like *Glasstech*, assessed the similarity of the alleged facts giving rise to the conversion claim with the alleged facts giving rise to the misappropriation claim under OUTSA.

Thermodyn argues it is inappropriate for a court to dismiss claims for OUTSA preemption at the summary judgment stage because the trier of fact may ultimately conclude some of the

information does not constitute a trade secret, and then the would-be OUTSA plaintiff could proceed with other state law remedies. The majority of courts examining the issue have concluded that the Uniform Trade Secret Act ("UTSA") preempts claims if the same set of facts support both the trade secret claim and the alternative claims. Under this line of authority, UTSA preemption can be decided at summary judgment. JAMES POOLEY, TRADE SECRETS § 2.03 (2008); *see, e.g., Ethypharm S.A. France v. Bentley Pharm., Inc.*, 388 F. Supp. 2d 426 (D. Del. 2005); *On-Line Techs., Inc. v. Perkin-Elmer Corp.*, 253 F. Supp. 2d 313 (D. Conn. 2003); *Smithfield Ham & Prods. Co., Inc. v. Portion Pac, Inc.*, 905 F. Supp. 346 (E.D. Va. 1995).

Under the minority view, which Thermodyn urges, preemption is available only if the information at issue proves to be a trade secret, and thus preemption can never occur prior to trial. POOLEY, § 2.03. Permitting common law claims premised on information that fails to qualify as a trade secret would seemingly undercut the statute's primary goal of uniformity, and potentially render parties liable for using information when the UTSA would not impose liability.

This Court agrees with the majority view. A determination of whether the information at issue constitutes a trade secret under OUTSA need not be addressed prior to making a determination of displacement. *Bliss Clearing Niagara, Inc. v. Midwest Brake Bond Co.*, 270 F. Supp. 2d 943, 948-49 (W.D. Mich. 2003) ("[T]he Court concludes that the disputed status of information as a trade secret does not preclude a court from determining whether a claim or claims are displaced by the M[ichigan version of] UTSA.").

Here, Thermodyn's conversion claim in its Complaint (Doc. No. 1, ¶¶ 119-20) merely regurgitates the accusations alleged in its misappropriation claim in Count Four. Thermodyn

acknowledges that "if the information 3M stole is ultimately determined to be a trade secret, its conversion claim is displaced by the OUTSA" (Doc. No. 81, p. 25).

Thermodyn argues that summary judgment is an inappropriate phase at which to evaluate preemption.  As discussed above, however, denying the Court the opportunity to assess preemption at summary judgment and allowing trade secret plaintiffs to argue other claims in the alternative at trial would render the displacement portion of OUTSA meaningless.  Dismissal based on preemption was inappropriate when Defendants filed a Motion to Dismiss because it was unclear whether discovery would enable Thermodyn to base its additional state law claims on facts different from those alleged in its trade secret claim.  The discovery has been completed, and no facts different from those comprising the misappropriation claim support the state common law state claims.

### Counts Six-Eight: Conspiracy, Unfair Competition and Unjust Enrichment

Counts Six through Eight are preempted under OUTSA.

As discussed above, R.C. § 1333.67 makes clear that a claim for misappropriation brought under OUTSA displaces other state law claims. The crucial question is whether "the claims are no more than a restatement of the same operative facts" that formed the basis of the plaintiff's statutory claim for trade secret appropriation. *Glasstech*, 50 F. Supp. 2d at 730.

Again, Thermodyn makes no novel allegations with respect to these claims in its Complaint, merely citing to previous allegations (Doc. No. 1, ¶¶ 122, 126, 129).  Discovery has not provided a different factual basis for these claims.  OUTSA displaces conflicting tort, restitutionary, and other laws of this state providing civil remedies for misappropriation of a trade secret.

A civil conspiracy claim is merely another civil remedy for misappropriation of a trade secret.

The conduct Thermodyn believes constitutes the basis of its unfair competition and unjust enrichment claims rests on the alleged misappropriation of Thermodyn's trade secrets.

The *Glasstech* court found that the plaintiff's unjust enrichment claim was preempted by the Act. *Glasstech*, 50 F. Supp. 2d at 731 (holding that OUTSA's exception for contractual remedies [R.C. § 1333.61(B)(1)] does not extend to quasi-contract because the claims utilized the same operative facts that gave rise to a claim for misappropriation of trade secrets). Here, Thermodyn alleges "Defendants have received the financial and competitive benefit of Thermodyn's information and Thermodyn has lost its financial expectation in developing and capitalizing upon its trade secret information" (Doc. No. 1, ¶ 129).

### MOTION TO CONSOLIDATE WITH STATE LAW ACTION

Plaintiff Thermodyn and the Kaufman Defendants filed a Joint Stipulation for Consolidation asking the Court to allow Thermodyn to amend its Complaint to add state law claims that are currently being litigated in the pending state court case. Defendant 3M/Dyneon opposes the proposal.

All parties acknowledge that this Court has no authority to assume jurisdiction over state law claims pending in state court. *See* Fed. R. Civ. P. 42 (federal court can only consolidate proceedings over which the federal court has jurisdiction); *see also Hilman v. Am. Axle & Mfg., Inc.*, No. 05-CV-73612, 2005 WL 2649265 at *3 (E.D. Mich. Oct. 17, 2005) ("While it is true that the two cases overlap to a great extent, the court cannot consolidate where, as here, it lacks jurisdiction over one of the two actions."). Instead, Thermodyn and Kaufman suggest that Thermodyn be permitted to amend its Complaint to add the claims that have been pending in state court since October 2006. This would include this Court adopting an injunction that was issued in the state court case and allowing all completed state court discovery to be admitted before this Court.

26

Permitting Thermodyn to amend its pleadings at this late stage would prejudice 3M/Dyneon, who is not a party to the pending state court action.  (Plaintiff in the state case is Thermodyn; defendants are Kaufman and FKM Industries.)  The claims pending in state court are similar but not identical to the claims currently before this Court.  Notably, the state case also contains a claim for breach of contract against Kaufman, something which is nowhere present in this Court.  Because 3M/Dyneon is not a party to the state case, 3M/Dyneon has not participated in discovery in that case; use of this discovery, when 3M/Dyneon was not able to participate, is clearly prejudicial.  Therefore, the Court declines the consolidation.

### CONCLUSION

For all of the foregoing reasons, the Court denies Plaintiff's Motion in Limine (Doc. No. 80) and grants Defendants' Motions for Summary Judgment (Doc. Nos. 72 & 75) as to Counts One, Two, Three, Five, Six, Seven, and Eight.  The Court grants in part and denies in part Defendants' Motions for Summary Judgment as to Count Four.  The Court denies Plaintiff's Motion for Partial Summary Judgment (Doc. No. 73) as to Counts One through Three.

The Court also declines to adopt the proposed Joint Stipulation (Doc. No. 104).

IT IS SO ORDERED.

_____s/ Jack Zouhary_____
JACK ZOUHARY
U. S. DISTRICT JUDGE

December 17, 2008